Filed 1/6/21  P. v. Thomas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRADLEY JORDAN THOMAS,<br><br>    Defendant and Appellant. | D076467<br><br><br>(Super. Ct. No. SCD270176) |


APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

Bradley Jordan Thomas, a caregiver at a residential memory care facility, admitted to sexually assaulting two elderly women, both of whom suffered from Alzheimer's disease.  A jury convicted Thomas of two counts of

rape of an incompetent person (Pen. Code, § 261, subd. (a)(1);[1] counts 1 and 5), two counts of lewd act on a dependent adult by a caretaker (*id.*, § 288, subd. (c)(2); counts 2 and 6), willful cruelty to an elder (*id.*, § 368, subd. (b)(1); count 3), and burglary (*id.*, § 459; count 4). On appeal, Thomas challenges only his conviction on count 3, willful cruelty to an elder, contending (1) substantial evidence does not support his conviction and (2) the trial court erred by failing to instruct on the lesser included offense of misdemeanor elder abuse. We reject Thomas's contentions and affirm the judgment.

FACTS

A. *Charges*

An amended information charged Thomas with rape of an incompetent person, Laurie H. (§ 261, subd. (a)(1); count 1), lewd act upon a dependent adult, Laurie H., by a caretaker (§ 288, subd. (c)(2); count 2), willful cruelty to an elder, Laurie H. (§ 368, subd. (b)(1); count 3), burglary (§ 459; count 4), rape of an incompetent person, Mary Z. (§ 261, subd. (a)(1); count 5), and lewd act upon a dependent adult, Mary Z., by a caretaker (§ 288, subd. (c)(2); count 6).[2]

---

[1]    Statutory references are to the Penal Code.

[2]    With respect to count 4 (burglary), the information alleged Thomas unlawfully entered a building with the intent to commit a rape or a lewd act on a dependent adult (§ 459), the burglary was of the inhabited portion of a building (§ 460, subd. (a)), the victim Laurie H. was aged 65 or older, and her disability and condition was known and reasonably should have been known to the defendant (§ 667.9, subd. (a)), and another person other than an accomplice was present in the residence during the commission of burglary (§ 667.5, subd. (c)(21)).

B. *Trial*

A medical social worker specializing in Alzheimer's disease and dementia testified that Alzheimer's is a progressive, fatal disease, and patients are typically categorized as experiencing early, middle, or late stage symptoms. In the later stages of Alzheimer's, patients still have the ability to feel pain, but may be unable to verbally express that pain, so one may have to look to their facial expressions and other nonverbal signs of pain.

Veronica S. testified she had been Laurie's caregiver at the memory care facility for over a year. Thomas was her coworker. Veronica described Laurie as a "sweet lady" and said she was capable of using "[s]ome words" to communicate her needs and feelings, but Veronica frequently would read Laurie's emotions "from her expression on her face." Laurie required assistance toileting, showering, and dressing.

On August 26, 2016, Thomas approached Veronica as she was entering data into CareTracker, the database caregivers used to track tasks completed for the residents. Laurie was following him. Veronica testified it was typical for Laurie to begin to wander around or follow a caretaker when she needed something; Veronica knew this was Laurie's way of communicating nonverbally that she needed something. Thomas told Veronica that Laurie wanted to go to her room, and Veronica said, " 'Okay.' " Veronica assumed they would be gone for five or ten minutes—enough time for Thomas to help Laurie use the restroom.

Forty-five minutes passed, and Veronica did not see Thomas or Laurie. She went to check on Laurie in her room. Veronica entered the locked room using her key.[3] The bathroom light was on, but the bedroom light was off.

---

[3] Veronica testified that the residents' rooms locked when the door closed, and the caretakers had keys to enter.

Veronica noticed there was an adult diaper on the bathroom floor; there was no "poop" in it. Veronica entered Laurie's bedroom and saw Laurie standing on the floor, bent over the bed, with her stomach on the bed and her head up near her pillow. Laurie was dressed from the waist up, but her pants were pulled down to the floor, with only one pant leg still on.[4] Thomas was standing behind Laurie. Laurie asked what Thomas was doing, and he said he was " 'just wiping her.' " Thomas was wearing gloves, and there were wipes on Laurie's bed, but there was no clean diaper or pullup nearby, and Veronica could not smell feces. Veronica made eye contact with Laurie and knew from Laurie's expression that "something was wrong." Thomas seemed nervous. Veronica noticed something coming out from Thomas's pants, under his apron. She approached him and lifted his apron and saw his erect penis poking through his open zipper of his pants.[5] Thomas said, " 'Oh, you know how I wear shorts underneath?' " Veronica told him she was going to report the incident. She found the activity director, and together they went to the executive director.

Veronica testified that Laurie went to the hospital later that day. Veronica was aware that Laurie had several rashes on her body that she was being treated for, but Veronica was not aware of Laurie ever having a bed sore or pressure ulcer. The morning after the incident, Veronica noticed

---

[4]     Veronica testified that a caregiver would never clean a resident in this manner, and that Laurie, who was capable of using the toilet with assistance, would typically be changed and cleaned in her bathroom.

[5]     Veronica testified that she saw more than half of the shaft of Thomas's penis, he was not wearing a condom, and she did not see any condoms or condom wrappers in the room.

Laurie had a new bandage "on her bottom," but Laurie did not complain of pain.

The executive director testified that the facility is a residential memory care facility for individuals suffering from Alzheimer's disease or dementia. Residents are typically "pretty advanced" in their decline; all are either under conservatorship or have relinquished power of attorney to a legal representative—usually a family member. The executive director testified both Laurie and Mary suffered from severe short-term memory loss and could not make legal decisions for themselves. The executive director testified that sometimes Laurie and others with dementia would "experience[] a different reality," or "express an altered reality."

The executive director testified that Thomas was hired as a dishwasher in March of 2016. After two months, he transitioned to become a caregiver. He was 19 years old at that time. On August 26, 2016, Thomas clocked in to work at 6:13 in the morning. A CareTracker report showed that Thomas had assisted 12 residents that day, including a female whose name begins with "M."

Early in the afternoon that day, Veronica and the activities director came to the executive director's office. They were agitated and said that Thomas had been caught in a resident's room with his penis exposed. The executive director immediately went to Laurie's room. Thomas was there, "shaking like a rabbit," his hands were trembling, and he had sweat on his upper lip and forehead. He was wearing pants with an apron over them and holding a plastic bag. He said he was " 'adjusting [him]self and [his] thing fell out of [his] basketball shorts.' " He said there was a hole in the basketball shorts he was wearing under his pants.

Thomas followed the executive director to her office, but on the way, he disappeared briefly and returned without the trash bag. The executive director did not believe this was unusual at the time; she assumed the bag contained a soiled diaper. At her office, she directed Thomas to write a statement describing what had occurred. After speaking with her boss, she called 911.

Officer Richard Perkins of the San Diego Police Department responded to the call from the memory care facility. He spoke to Laurie when she was in the back of an ambulance, parked in front of the facility. Laurie said she had a boyfriend and described him as a "white guy." She said "[i]t was several years in the past," and "she didn't want to have sex with him and he was very rough and aggressive." Officer Perkins discontinued the interview because he felt Laurie was unable to give a coherent statement and was "not answering [his questions] appropriately." Officer Perkins met Thomas later that day and observed that he is "not a white guy."

The emergency medical technician (EMT) who responded to the memory care facility that day testified he assisted moving Laurie onto a gurney inside the facility and transported her to the ambulance parked outside. During an initial assessment, Laurie said she was not in any pain, but the EMT and his partner noticed Laurie "began shifting, acting uncomfortable on the gurney." The partner asked if she was in pain, and "she indicated that her bottom was sore." She described the pain as specific to her anus or rectal area. She continued to shift on the gurney, like she was uncomfortable in her seat. She continually repeated that " 'he' " or " 'her boyfriend' " " 'was just so aggressive.' " The EMT testified Laurie said, "there

6

was intercourse had with her boyfriend that day," and "she did say a couple times that she had asked to stop and then said, 'No' and to stop."[6]

A forensic nurse examiner testified she conducts "sexual assault response team" (SART) examinations of alleged victims of sexual assault, during which she documents patient's injuries and collects samples for DNA testing. The forensic nurse examiner performed a SART examination on Laurie the evening of August 26. She observed that Laurie had a "general body rash with some open sores" from scratching. On her tailbone, "at the top of her butt crack," she had the beginning of a decubitus ulcer. The forensic nurse examiner collected DNA samples from Laurie's mouth and genitals.

During the exam, Laurie squirmed on the table and said, " 'Ow.' " The forensic nurse examiner observed that Laurie had a skin abrasion in her vaginal area, extending toward her anus.[7] Such a tear was consistent with sexual activity, but also could be caused by wiping that area when using the toilet. The forensic nurse examiner testified, "Laurie is elderly, so her skin is more compromised because of her age as well as the fact she has some incontinent issues. She's unable to control her bladder and bowel at all times. And having that fissure in that area can make the skin break down and make it more friable or sensitive that even wiping in that area during cleaning or using the toilet can cause injury to that area."

---

[6] The EMT testified he remembered that day because some things "stick[] out in your head," and that day is "hard to forget."

[7] The forensic nurse examiner's report documented "an abrasion of the fossa with extension into the posterior fourchette."

The forensic nurse examiner later conducted a SART examination of Thomas, including obtaining oral and genital DNA samples.[8]

San Diego Police Sergeant Esmeralda Tagaban testified that Thomas was interviewed by police the day of the incident. He did not admit any wrongdoing and was released from police custody. Police continued with their investigation, including obtaining DNA comparisons of the samples taken by the forensic nurse examiner. DNA test results prompted police to arrest Thomas.[9]

On January 4, 2017, Sergeant Tagaban, along with her colleague Detective Romano, interviewed Thomas. A video of the interview was played for the jury. Thomas told the investigators he played football when he was younger, but more recently he preferred playing basketball in pickup games. He told them he began working at the memory care facility in the kitchen, washing dishes.[10] They moved him to caretaking, which he did for a few months.

---

[8] During the examination, the forensic nurse examiner observed Thomas was wearing pants with a belt attached, "basketball-kind-of-style shorts," and "boxer-style shorts under that." She bagged these items individually as evidence.

[9] After the forensic testing was completed, police inspected and photographed the items of clothing Thomas was wearing the day of the incident. Sergeant Tagaban testified she did not see any holes in Thomas's basketball shorts. The clothing items were shown to the jury. At one juror's request, the basketball shorts were turned inside out and inspected further.

[10] The investigator read Thomas his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, and Thomas agreed to discuss the allegations against him.

Thomas told the investigators he was cleaning Laurie's backside with wipes, which took a lot of time because she had a lot of dried "poop" on her backside. As he finished cleaning her, he put the wipes he used into a bag, and realized "the belting situation . . . kept irritating [him]." He thought he could quickly fix his belt, but Veronica walked into the room as he was adjusting his belt. He was wearing nylon basketball shorts underneath his work pants, and an apron over that. Thomas said he was required to wear a half apron; it covered his zipper. His fly was down, and his penis was "up in [his] basketball shorts."

Initially, Thomas denied putting his penis or fingers inside Laurie's vagina. He said he did not have "a very high sex drive," and his family made "gay jokes" about him. Thomas said he had "never been attracted to a guy" but he had not "been attracted to a girl either." He denied becoming sexually aroused around older women.

When asked what made him "do what [he] did" to Laurie, Thomas stated he "want[ed] to explain [him]self" but he was worried that "anything that [he] [said] is just going to sound like an excuse." He said, "it's not like I was thinking about it at all. I would, I, I wouldn't, uh, like I'm not, I'm not at home thinking about like oh, like I need to do terrible things."

Investigators asked if he was sorry he put his penis inside Laurie, and Thomas said, "I didn't mean to do it." He said his mother would disapprove of him being gay. He said he "needed proof," and he thought "if I can't even do this, and that means for sure I'm gay, and then I might as well just die." He denied ejaculating in Laurie and said he "stopped maybe like right after [he] started." He said he did not think he was hurting her.

Investigators asked Thomas how many other clients he did similar things to, and Thomas replied, "There was only one other time." He said he

9

did not know what her name was, but he thought it started with an M. He said it occurred earlier the same day. He said, "It was just the same thing." He said, "That one felt just as bad as Laurie. I didn't like it at all, so . . . ." He said, "I didn't just force myself. I don't think that—I didn't hurt them at all." He said when he was waking M. up for her breakfast, she mistook him for her husband. He said "she didn't initiate it" but "that was when . . . [he] got that idea." He said he had sex with her on her bed.

Thomas agreed to write an apology letter to Laurie and "Miss M." The apology letter was introduced as a trial exhibit and published for the jury to read. The first line of the letter read, " 'I'm so deeply sorry for what I have done.' " Thomas described himself as a " 'monster' " and asked for sympathy.

Thomas's interview prompted the police to investigate a potential second victim, including requesting additional lab tests. Three female residents whose names began with M. were identified. One of the three women, however, had not lived there at the time of the incident. Thomas's work records indicated he had assisted Mary Z. early in the morning on August 26, which made her the most likely victim. After obtaining consent from Mary's family, Detective Romano obtained a DNA sample from her.

Kathy C., a nurse and geriatric care manager, has known Laurie since 2008 and began working as her care manager in 2011. She accompanied Laurie to the hospital on August 26 and stayed with her during her examination. During the time that Kathy was Laurie's care manager, Laurie never complained of vaginal pain or had gynecological issues, and never hurt herself trying to clean herself. Laurie frequently talked about her "boyfriends" and would always call men that she met "her boyfriend," even though she "never had a boyfriend in the time that [Kathy] knew her." Before the incident on August 26, Laurie had never discussed a sex act,

complained of a boyfriend being aggressive, or discussed telling a boyfriend to stop.

A criminalist from the San Diego Police Department testified he examined and performed DNA testing on vaginal swabs obtained from Laurie, and penile and scrotal swabs obtained from Thomas. Thomas's sperm cells were detected on the penile swab. Laurie's DNA was detected on the penile swab and the scrotal swab. Thomas "and all paternally related males" in his lineage were identified as the source of DNA on Laurie's vaginal swab. Laurie's DNA was also detected in Thomas's underwear.[11]

Mary's DNA did not match the penile, scrotal, or vaginal swabs from the original SART kits of Thomas and Laurie. However, when the criminalist obtained a DNA swab of the inside, front area of Thomas's underwear ("where the wearer's genitals would come into contact with it"), both Mary's and Laurie's DNA were detected on the underwear swab, in amounts the criminalist described as "quite high."[12] Thomas's sperm cells were also detected in his underwear, which the criminalist opined, "suggests sexual activity." The presence of significant amounts of Mary and Laurie's DNA indicated to the criminalist that there was "definitely a possibility that there was sexual contact between those individuals," but also could be caused

---

[11]   Sperm cells were not detected on Laurie's internal vaginal swab. According to the criminalist, if someone was interrupted during a sex act, or wearing a condom, it is possible that no sperm cells will be detected on an internal vaginal swab.

[12]   The criminalist testified that a DNA test of the underwear swab demonstrated there were three contributors: an 85 percent contributor, a 10 percent contributor, and a 5 percent contributor. Thomas "was consistent with being the 5 percent contributor." There was "strong support" that Laurie was the 85 percent contributor (143 septillion times more likely) and Mary was the 10 percent contributor (56.4 million times more likely).

11

through "touch or transfer DNA." The criminalist said it was "within the realm of possibilities" that this DNA could result from nonsexual, touch or transfer contact but noted that, "[a]ssuming you are fully dressed," the inside of someone's underwear "is a very protected area that is not open, exposed to the environment very often."

The parties stipulated to the birth dates of the victims, which established that Laurie was 73 years old and Mary was 82 years old on August 26, 2016.

The parties further stipulated that Laurie was transported by ambulance to the hospital on August 26, 2016, that her chief complaint upon admission was " 'rectum pain secondary to possible sexual assault,' " that, on arrival, the medical record notes that " 'patient is calm, oriented to name only, and complains, "It hurts all the way in the back," ' " and that a rectal examination was conducted that showed Laurie had a sacral decubitus ulcer that was approximately one centimeter by one centimeter.[13]

C. *Closing Arguments*

The prosecutor argued the case was not complicated: "The Defendant's penis was out. Laurie is lying with her pants down in a sex position. He gives a ridiculous excuse. Laurie is injured, and she's talking about the fact that someone was rough with her, and it was sexual. The Defendant confessed to raping both of these women." The prosecutor further argued "the DNA is just overwhelming."

Defense counsel argued Thomas is "dumb" and "young," and "this was a sorely misunderstood case." Counsel argued Thomas's confession to the police was a false confession, triggered by intensive police pressure tactics,

---

[13] "Decubitus ulcer" is a medical term for a bed sore or pressure sore.

and Veronica's account of the incident was not truthful. Counsel emphasized the criminalist's testimony that it was "within the realm of possibility" that the DNA got there without a sex act. Counsel suggested that masturbation would account for the presence of sperm cells in Thomas's underwear, and that Thomas's account of adjusting himself after wiping Laurie could account for the presence of her DNA. He emphasized that Mary's DNA was not found on Thomas's penis or scrotum, "when you should expect it to be there."

D. *Conviction and Sentencing*

The jury found Thomas guilty of all charges and found the allegations to be true. The trial court sentenced him to a total prison term of eight years, comprised of six years on count 1, plus a consecutive two years (one-third the midterm) on count 5. The trial court also imposed sentences on counts 2, 3, 4, and 6, but stayed them under section 654.

DISCUSSION

I.

*Sufficiency of the Evidence*

Thomas was convicted in count 3 of willful cruelty to an elder in violation of section 368, subdivision (b)(1), which provides, "A person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is

13

endangered, is punishable . . . by imprisonment in the state prison for two, three, or four years."[14]

Thomas contends this conviction must be reversed because there was no substantial evidence he engaged in conduct likely to produce great bodily harm or death to Laurie.

In response to Thomas's challenge to the sufficiency of the evidence supporting his conviction, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) We must "determine whether [the record] discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

---

14    The statute was amended after Thomas committed the crimes but before trial (Stats. 2018, ch. 70, § 3, (Assem. Bill No. 1934), eff. Jan. 1, 2019); however, subdivision (b)(1) was not substantively altered.

14

In *People v. Clark* (2011) 201 Cal.App.4th 235 (*Clark*), the court listed several factors a jury may consider in determining whether abuse was inflicted under circumstances or conditions likely to produce great bodily injury:  the characteristics of the victim and defendant, the characteristics of the location where the abuse occurred, the potential response or resistance by the victim to the abuse, any injuries actually inflicted, any pain sustained by the victim, and the nature and amount of force used by the defendant.  (*Id*. at p. 245;[15] see also *People v. Racy* (2007) 148 Cal.App.4th 1327 (*Racy*) [addressing felony elder abuse involving use of a stun gun under conditions likely to produce great bodily harm].)

Here, as in *Clark*, "a rational jury could have found that the totality of the circumstances and conditions created a substantial danger of great bodily injury." (*Clark, supra*, 201 Cal.App.4th at p. 245; see *Racy, supra*, 148 Cal.App.4th at p. 1334 ["[I]n a trial for elder abuse, a jury is not required to unanimously agree on one circumstance or condition that was likely to produce great bodily harm or death, but rather, may consider all the 'circumstances or conditions' that were likely to produce great bodily harm or death."].)  Laurie was elderly and infirm—she was a 73-year-old woman suffering from Alzheimer's disease who required assistance to use the restroom, shower, and dress, while Thomas was young and capable—he was a 19-year-old man who enjoyed playing pickup basketball.  The incident occurred when Laurie was alone in her locked bedroom with Thomas, within

---

15      *Clark* analyzed circumstances likely to produce bodily injury under section 273a, a child abuse statute.  Our Supreme Court in *People v. Valdez* (2002) 27 Cal.4th 778, 785, footnote 4 (*Valdez*), recognized that "[s]ection 368 [elder abuse statute] was patterned on and is virtually identical to section 273a [child abuse statute]," and "[c]ases interpreting one section are therefore appropriately used to interpret the other."

the memory care facility where Thomas was employed as her caregiver. Laurie was vulnerable and unable to obtain assistance, as the individual responsible for providing that assistance was the one sexually abusing her. Laurie was standing on the floor, bent over her bed, when Thomas raped her—creating the potential for her to fall and sustain further injury. (See *Racy*, at p. 1333 ["as a matter of common knowledge" victim's age of 74 years is "an age that carries with it an increased risk of bone fractures from a fall"].) Due to her advanced age, Laurie's skin was "compromised" and fragile. Shortly after the incident, Laurie exhibited signs of physical discomfort and was found to have sustained an abrasion to her vaginal area and a decubitus ulcer on her tailbone. After the incident, Laurie complained " 'her boyfriend' " " 'was just so aggressive' " during a sex act and that she had asked him to stop, and said, " 'No,' " evidencing Thomas's use of aggression and force to accomplish the rape and abuse.

Thus, all of the *Clark* factors—the characteristics of the victim and defendant, the characteristics of the location where the incident occurred, the potential response by the victim to the abuse, the injuries actually inflicted, the pain sustained by the victim, and the nature and amount of force used by the defendant—support the jury's conclusion that Thomas willfully caused Laurie to suffer "under circumstances or conditions likely to produce great bodily harm." (*Clark*, *supra*, 201 Cal.App.4th at p. 245.) We therefore conclude there is " ' "sufficient substantial evidence to support" ' the jury's verdict." (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

Thomas's arguments do not persuade us to reach a different result. Thomas contends Laurie's injuries were minor, and there was no evidence of any ongoing injury or pain, and no evidence Thomas actually injured her. Thomas's focus on the existence and severity of the victim's injuries is

16

misplaced. The purpose of the elder abuse statute is to protect the elderly from an abusive situation in which the probability of serious injury is great. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1216 ["Section 273a(1) [child abuse statute] is 'intended to protect a child from an abusive situation in which the probability of serious injury is great.' "]; *Valdez, supra*, 27 Cal.4th at p. 785, fn. 4.) While the extent of a victim's actual injuries is a relevant factor, "[t]here is no requirement that the victim actually sustain great bodily injury." (*Clark, supra*, 201 Cal.App.4th at pp. 243, 245, fn. 6; *Roman v. Superior Court* (2003) 113 Cal.App.4th 27, 35 [no requirement under section 368, subd. (b)(1) that victim actually suffer great bodily injury].)[16]

Citing *People v. Sargent* (1978) 86 Cal.App.3d 148, 150-151, Thomas further contends that "[r]ape by itself does not constitute great bodily injury." But the jury was not instructed to find great bodily injury based solely on the commission of a rape. The relevant inquiry instead was whether Thomas raped Laurie under conditions and circumstances likely to produce great bodily injury. The victim's advanced age, physical limitations, vulnerabilities, and complaints following the incident, were all relevant "circumstances" and "conditions" for the jury to consider. (See *People v. Thiel* (2016) 5 Cal.App.5th 1201, 1213 [the language " 'under circumstances or

---

[16]     Thomas also minimizes evidence supporting an inference that Laurie *was* injured as a result of the rape. Thomas contends that "mere soreness without additional specific facts about what caused it did not demonstrate conduct likely to cause great bodily injury." However, the jury could reasonably infer that the injuries were caused by the incident because the evidence showed the presence of soreness and injury shortly after the incident that did not exist before. (See *People v. Escobar* (1992) 3 Cal.4th 740, 755 (conc. opn. of Mosk, J.) [discussing victim's condition after rape and noting that, even when "a causal link between defendant's acts and the victim's condition is not proved by direct evidence," causation "does indeed arise as a reasonable inference from the facts in their entirety"].)

conditions likely to produce great bodily harm or death' " "merely 'states the context in which the subdivision applies' [citation] and is a question of fact for the jury"].) These conditions under which Laurie suffered elder abuse—the rape of an elderly, dependent woman by her caretaker, while bent over her bed, causing vaginal abrasion and lingering pain—were likely to cause great bodily injury. Substantial evidence supports Thomas's conviction for felony elder abuse.

## II.

### *Failure to Sua Sponte Instruct on Lesser Included Offense*

Thomas contends the trial court had a sua sponte duty to instruct on the lesser included offense of misdemeanor elder abuse because "Laurie did not sustain great bodily injury," "there was no evidence of any ongoing injury or pain," and "[t]here was no evidence [Thomas] did anything likely to cause Laurie great bodily injury or death." He further contends the failure to instruct on misdemeanor elder abuse constitutes prejudicial error requiring reversal of his conviction.

### A. *Additional Background*

As previously noted, Thomas was convicted of felony elder abuse in violation of section 368, subdivision (b)(1). The jury was instructed with a modified version of CALCRIM No. 830, which required the prosecutor to prove: "(1) The defendant, while having care or custody of Laurie H. willfully caused or permitted her to be placed in a situation where her person or health was endangered; (2) The defendant caused or permitted Laurie H. to be endangered under circumstances or conditions likely to produce great bodily harm or death; (3) Laurie H. is an elder; (4) When the defendant acted, he knew or reasonably should have known that Laurie was an elder; and (5) The defendant was criminally negligent when he caused or permitted

18

Laurie H. to be endangered" (some capitalization omitted). The jury was instructed, " 'Great bodily injury' means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." The jury was further instructed, "An elder does not need to actually suffer great bodily harm. But if an elder does suffer great bodily harm, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed the offense."

" '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Smith* (2013) 57 Cal.4th 232, 240.) "Misdemeanor elder abuse is a lesser included offense of felony elder abuse." (*Racy*, *supra*, 148 Cal.App.4th at p. 1334.) The only distinction between the two crimes is the circumstances under which they are committed. Unlike felony elder abuse, which is committed "under circumstances or conditions likely to produce great bodily harm or death" (§ 368, subd. (b)(1)), misdemeanor elder abuse is committed "under circumstances or conditions other than those likely to produce great bodily harm or death" (§ 368, subd. (c)).

The jury here was not instructed on the lesser included offense of misdemeanor elder abuse. We independently determine whether an instruction on a lesser included offense should have been given. (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

B. *An Instruction on Misdemeanor Elder Abuse Was Not Required*

"A trial court is obligated to instruct on lesser included offenses sua sponte if there is substantial evidence all the elements of the charged offense are not present." (*People v. Wright* (1996) 52 Cal.App.4th 203, 208-209.) A

19

trial court must instruct "on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)  "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed."  (*Ibid*.)  "Such instructions are required only when there is substantial evidence that, if the defendant is guilty at all, he is guilty of the lesser offense, but not the greater."  (*People v. Wyatt* (2012) 55 Cal.4th 694, 704 (*Wyatt*); see *People v. Barton* (1995) 12 Cal.4th 186, 195, fn. 4 [trial court's sua sponte duty to instruct on a lesser included offense is triggered "only when the evidence [of the lesser-included offense] is substantial enough to merit consideration by the jury."].)

As previously noted, the only distinction between felony and misdemeanor elder abuse is the circumstances under which each crime is committed.  For the jury to conclude that Thomas committed the lesser, but not the greater, offense, it would have to find that he acted "under circumstances or conditions *other than* those likely to produce great bodily harm or death."  (§ 368, subd. (c), italics added.)  Based on the record, the jury was unlikely to have reached such a conclusion.  The evidence demonstrated that Thomas bent Laurie over her bed and raped her.  Laurie was elderly and vulnerable, susceptible to falls, and her skin was fragile and "compromised."  After the rape, she physically manifested signs of pain and

20

told a police officer "she didn't want to have sex with him and he was very rough and aggressive." She told the EMT " 'her boyfriend' " " 'was just so aggressive,' " and she asked him to stop and said, " 'No.' " She was found to have sustained an abrasion on her vaginal area and a decubitus ulcer on her tailbone. This evidence strongly supports the inference that the circumstances and conditions of Thomas's sexual assault made great bodily injury to Laurie likely. No evidence to the contrary was presented that Thomas acted under circumstances or conditions that were not likely to produce great bodily harm. Thomas did not testify; defense counsel merely asserted during closing argument that Thomas was "adjust[ing] himself" when his coworker walked in on him standing behind the victim, his coworker's testimony about what she saw (including the defendant's erect penis) was not true or believable, the investigation was biased, and his confession was coerced. These efforts to cast doubt on the prosecution's case are not sufficient to show the trial court was required to instruct on misdemeanor elder abuse. (See *People v. Acevedo* (1985) 166 Cal.App.3d 196, 201 ["disbelief of all or part of the prosecution case does not require instruction on lesser included offenses"].)

Because there was no substantial evidence Thomas committed elder abuse under circumstances other than those likely to produce great bodily injury, the trial court had no obligation to instruct on the offense of misdemeanor elder abuse. (*Wyatt, supra*, 55 Cal.4th at p. 704; cf. *Racy, supra*, 148 Cal.App.4th at p. 1336 [defendant entitled to instruction on misdemeanor elder abuse where "it is reasonable the jury could have viewed [the victim who was 6 feet, three-inches tall, and weighed 210 pounds] as a rather large man who was not likely to suffer great bodily injury or death during the incident despite his age and physical limitations"].)

C. *Any Assumed Error Was Harmless*

Even assuming the trial court should have instructed the jury on misdemeanor elder abuse, any assumed error was harmless. A trial court's failure to instruct sua sponte on a lesser included offense "is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Breverman, supra,* 19 Cal.4th at p. 165; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)[17] " 'The question is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed.' " (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831.) In making this determination, we may consider the relative strengths and weaknesses of the evidence supporting the greater and lesser offenses, the jury "instructions as a whole, the jury's findings, and the closing arguments" of the parties. (*Ibid.*)

As discussed, for the jury to conclude that Thomas committed the lesser, but not the greater, offense, it would have to find that he acted "under circumstances or conditions other than those likely to produce great bodily harm or death" (§ 368, subd. (c)). Based on the record, the jury was unlikely to have reached such a conclusion. Thomas raped a defenseless 73-year-old woman who suffered from Alzheimer's and required assistance with routine daily tasks. She was isolated in a locked room in the dark when she was sexually abused by her own caretaker. The abuse was interrupted when a

---

[17] We reject Thomas's contention the failure to instruct violated his federal due process rights. Thomas does not explain how the failure to instruct on misdemeanor elder abuse deprived him of a fundamentally fair trial. Thomas relies on dicta from *Breverman* to support his contention that error should be analyzed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, but this reliance is misplaced, as *Breverman* plainly requires application of the *Watson* standard.

coworker walked in as Thomas stood behind Laurie—who was bent over her bed with her pants pulled down to the floor—with his erect penis exposed. After the incident, Laurie stated that her "boyfriend" had been "very rough and aggressive," she told him " '[n]o' and to stop," and she showed signs of pain and discomfort. The defendant confessed to raping two elderly women, and described himself as a "monster" in an apology letter he wrote stating he was "truly[,] truly sorry" for what he did.[18] There was ample evidence that Thomas's actions would likely result in Laurie suffering great bodily injury.

By contrast, there was no evidence to support the conclusion that Thomas committed elder abuse under circumstances that were not likely to result in great bodily harm to his victim. The defense Thomas asserted at trial was inconsistent with the lesser included offense. The defense theory was that Thomas did not touch Laurie in *any* inappropriate manner—i.e., he did not "willfully cause[] . . . any elder or dependent adult to suffer, or inflict[] thereon unjustifiable physical pain or mental suffering" (§ 368, subds. (b)(1), (c)). Thomas argued he was innocently adjusting himself after wiping Laurie clean, and the circumstances were grossly misconstrued (or his coworker was not telling the truth). Had the jury credited Thomas's theory, he would not be guilty of *either* a misdemeanor or felony elder abuse crime because the jury would have believed Thomas did not willfully cause Laurie any pain or suffering. But the jury was convinced beyond a reasonable doubt that Thomas raped Laurie, committed a lewd act on Laurie, and entered her residence with the intent to commit rape or a lewd act. Although the jury's verdict on the felony offense is not dispositive, based on the record here it further supports our conclusion that it is not reasonably probable Thomas

---

18    Although defense counsel suggested during closing arguments that Thomas's confession was coerced, the jury obviously rejected this argument.

would have obtained a more favorable outcome had the misdemeanor instruction been given.  (*Breverman*, *supra*, 19 Cal.4th at p. 178 [reversal not warranted unless "it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred"].)

DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:



HUFFMAN, Acting P. J.



HALLER, J.